PRISONERS' LABOR UNION AT MARQUETTE v DEPARTMENT
OF CORRECTIONS

WORK AND LABOR—LABOR RELATIONS—PUBLIC EMPLOYEES—PRISONS—
CONVICTS—EMPLOYMENT RELATIONS COMMISSION—STATUTES.

The relationship between the inmates of Michigan correctional
institutions and the Department of Corrections, as created and
governed by the Correctional Industries Act, is not an employ-
ment relationship but a custodial, rehabilitative relationship
with employment utilized as a means to reach those ends;
therefore, inmates are not "public employees" within the mean-
ing of the public employment relations act and are not subject
to the jurisdiction of the Employment Relations Commission
(MCLA 423.201 *et seq.,* 800.321 *et seq.).*

Appeal from the Employment Relations Com-
mission. Submitted Division 1 December 11, 1974,
at Detroit. (Docket Nos. 19936–19939.) Decided
May 29, 1975. Leave to appeal denied, 394 Mich
843.

Petitions by inmates of Michigan correctional
facilities, plaintiffs, before the Employment Rela-
tions Commission, alleging unfair labor practices
by the Department of Corrections and seeking
elections to certify representatives for purposes of
collective bargaining. Petitions dismissed for lack
of jurisdiction. Plaintiffs appeal. Affirmed.

*Keller, Cohn & Svenson, Arthur J. Tarnow* and
*James B. VeuCasovic,* for plaintiffs.

*Frank J. Kelley,* Attorney General, *Robert A.*

REFERENCE FOR POINTS IN HEADNOTE
60 Am Jur 2d, Penal and Correctional Institutions § 34 *et seq.*

*Derengoski,* Solicitor General, and *Terrence P. Grady,* Assistant Solicitor General, for defendant.

Before: BRONSON, P. J., and MCGREGOR and CARLAND,* JJ.

BRONSON, P. J. We are called upon to decide the following question of first impression:

*Are plaintiff-appellant inmates "public employees" within the meaning of the public employment relations act (PERA), MCLA 423.201 et seq.; MSA 17.455(1) et seq., and therefore subject to the jurisdiction of the Michigan Employment Relations Commission (MERC)?*

Seeking official recognition of this asserted employee status, the inmates petitioned[1] MERC to hold elections to certify representatives for purposes of collective bargaining. The inmates also filed unfair labor practice charges, naming the defendant-appellee, Michigan Department of Corrections, as employer. The Department of Corrections responded by filing a motion to dismiss the petitions on the ground that MERC did not have jurisdiction to consider the inmates' claims.

Evidentiary hearings were conducted on September 12 and November 21, 1972, limited to the jurisdictional issue raised in the motion to dismiss. That motion was granted by written opinion of the administrative law judge on September 14, 1973. His recommended order was affirmed on appeal to MERC on March 19, 1974. The inmates appeal as of right[2] from MERC's decision.

---

* Former circuit judge, sitting on the Court of Appeals by assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

[1] The inmates incarcerated at Marquette Branch Prison filed this petition on May 1, 1972. The inmates of the State Prison of Southern Michigan (Jackson) followed suit on June 5, 1972.

[2] *Michigan Employment Relations Commission v Reeths-Puffer School District,* 391 Mich 253, 270, n 23; 215 NW2d 672 (1974).

It is undisputed that MERC has jurisdiction over the inmates' claims if, and only if, those inmates are "public employees" within the meaning given that term in PERA.[3]

An all-inclusive operational definition of the term "public employee" is not included in PERA. Instead, we find the following language in MCLA 423.202; MSA 17.455(2):

"No person holding a position by appointment or employment in the government of the state of Michigan, or in the government of any 1 or more of the political subdivisions thereof, or in the public school service, or in any public or special district, or in the service of any authority, commission, or board, or in any other branch of the public service, hereinafter called a 'public employee,' shall strike."

Because this statutory language does not clearly include or exclude prison inmates from the coverage of PERA, whether inmates are "public employees" cannot be answered without attempting to determine legislative intent. The problem presented may be characterized as "the ascertainment of legislative intent when there is no evidentiary or other reasonably authoritative guide to pertinent meaning or purpose of the legislators". *Wayne County Civil Service Commission v Board of Supervisors,* 384 Mich 363, 367; 184 NW2d 201 (1971). There, the Court referred to Justice Cardozo for guidance as to the nature of such an inquiry:

" 'Interpretation is often spoken of as if it were nothing but the search and the discovery of a meaning which, however obscure and latent, had none the less a

---

[3] MERC has been granted jurisdiction over public employee labor disputes in MCLA 423.216; MSA 17.455(16), MCLA 423.201; MSA 17.455(1).

real and ascertainable pre-existence in the legislator's mind. The process is, indeed, that at times, but it is often something more. The ascertainment of intention may be the least of a judge's troubles in ascribing meaning to a statute. "The fact is," says Gray in his lectures on the "Nature and Sources of the Law," "that the difficulties of so-called interpretation arise when the legislature has had no meaning at all; when the question which is raised on the statute never occurred to it; when what the judges have to do is, not to determine what the legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present." ' " *Wayne County Civil Service Commission v Board of Supervisors, supra,* at 367–368.

While the Legislature has not explained what it meant by "public employee" in PERA, it has supplied a very comprehensive definition of the relationship that is to exist between inmates and the Department of Corrections in another statute, enacted over 20 years after PERA became law. Careful study of its provisions suggests that the relationship established between the Department of Corrections and the inmates is preeminently a noneconomic one.

The Correctional Industries Act, MCLA 800.321 *et seq.;* MSA 28.1540(1) *et seq.,* is designed—according to its title—to "provide for the employment of inmate labor in correctional institutions of this state". The Department of Corrections Commission is charged with administering the act. MCLA 800.323; MSA 28.1540(3). Employment is to be provided "as fully as practicable". MCLA 800.327; MSA 28.1540(7). "Wages" may be paid out of a revolving fund which is financed by the sale of goods manufactured by inmate labor. MCLA 800.325; MSA 28.1540(5). Specifications and standards identical to those imposed on outside sources

must be met by correctional institution products. MCLA 800.328; MSA 28.1540(8).

The inmates have stressed these and other[4] trappings of conventional employment in support of their claim that they are public employees. However, a closer look at the act and the actual relationship between inmates and the Department of Corrections established thereunder forces the conclusion that "employment"—in the usual sense of that term[5]—was not of primary concern to the Legislature when the Correctional Industries Act was passed.

The Legislature has explicitly furnished its intent in § 11 of the act. The first two items listed are:

"(a) To provide adequate, regular, diversified and suitable employment for inmates of the state consistent with proper penal purposes.

"(b) To utilize the labor of inmates *exclusively* for self-maintenance and for reimbursing the state for expenses incurred by reason of their crimes and imprisonment." (Emphasis added.) MCLA 800.331; MSA 28.1540(11).

The statute thus provides that inmates are employed by the state *solely* to insure self-mainte-

---

[4] *E.g.,* 1) work is performed on an organized, regular basis, 2) inmates are free to give or withhold services, 3) inmates may request assignments and refuse promotions, 4) inmates are paid on a graduated scale and receive overtime pay, 5) time cards are used, 6) compensation received has some relation to the complexity of the task, 7) inmates are supervised by corrections employees and fellow inmates, 8) the products of inmate labor are sold, 9) inmate wages are derived from the sale of inmate labor, 10) production volume is not insignificant and sales receipts help to reduce the cost of maintaining the prison system.

[5] Unless it manifestly appears otherwise, we are bound to construe words "according to the common and approved usage of the language". MCLA 8.3a; MSA 2.212(1).

nance and reimbursement[6] and only if "consistent with proper penal purposes". Employment is not designed to maximize profits for the state and is only incidentally concerned with providing goods and services to other governmental agencies. Thus correctional industry in Michigan is primarily correctional and only secondarily industrial.[7]

The "proper penal purposes" are disclosed in another section of the act, which lists, in order of priority, the types of permissible employment alternatives for inmates. The two most important types of employment are:

"(a) Routine, maintenance and constructive activities contributing to the conduct of the several institutions in a manner most favorable to their correctional and rehabilitative purposes and to the minimum costs to the state.

"(b) Educational and rehabilitation activities, whether formal or through productive or socialized activities, determined on the basis of individual needs and educability." MCLA 800.327; MSA 28.1540(7).

In addition, the Legislature again mandates that employment of inmates be "consistent with the penal and rehabilitative purposes of their imprisonment and with the public economy". MCLA 800.327; MSA 28.1540(7).

This dedication to rehabilitation is further reinforced in § 12, which announces the purposes behind providing "wages". Indeed, the term "wages", used earlier in § 5, disappears in § 12. Instead, the following language is used:

---

[6] The importance of reimbursement is underscored in MCLA 800.401 *et seq.;* MSA 28.1701 *et seq.,* the Prison Reimbursement Act.

[7] The sale of manufacturered goods is severely restricted, MCLA 800.326; MSA 28.1540(6), and the Legislature has made it clear that no competition with private industry is permitted. MCLA 800.331(c); MSA 28.1540(11)(c).

"The corrections commission may adopt a schedule of payments or allowances to inmates or to their dependents from such funds as may be provided therefor, but such payments shall be made on the basis of need or of motivation or of reward for industry or behavior and shall not be related to profits to the state from the activities to which the prisoners may be assigned." MCLA 800.332; MSA 28.1540(12).

That a traditional employment relationship has not been established is clearly revealed in a study of the manner in which the Correctional Industries Act has been implemented. Inmates are assigned a task by a "classification committee" upon entry. They may become trainees on a job for which they have no experience, even if they are skilled in some other area. Evidence introduced at the hearing indicates that many inmates are trained for several occupations during their incarceration, and that shifts from job to job are not infrequent. Classification is designed to develop a self-improvement program best suited for the individual. It is a continuing process. Job classification is part of that process.

While inmates have a good deal of control over job assignments, the emphasis on job training in varied job experience indicates that rehabilitation, not efficiency economics, is the goal of inmate employment. The inmates stress that because they are allowed input into the decision on job assignments, they voluntarily enter into an employment relationship and must be considered "employees". Allowing for inmate choice is, however, also an important aspect of any successful rehabilitation program. Inmate choice is provided not to insure that a conventional employer/employee relationship is established, but to further the statutorily imposed goal of rehabilitation.

Other aspects of the inmate/Department of Corrections relationship are important indicators of the prevalence of the rehabilitative ideal. Inmates have no right to payment for their work, since any "allowances" received depend on the discretion of the corrections commission and the extent to which such payments encourage inmates to become receptive to rehabilitation. MCLA 800.332; MSA 28.1540(12). Evidence introduced at the hearing discloses that all inmates receive such allowances, including those who are students, sick or disabled, on the basis of need, motivation, industry or good behavior. Moreover, no paycheck is ever received. Instead, the inmate's "account" at the institution is credited and the amounts credited can be "spent" only within the institution through a voucher system. In addition, an absolute seniority system is maintained. A particular inmate's previous work experience will never serve to "bump" a less experienced inmate with seniority.[8] Such a practice serves the purpose of assuring stability and order within the institution but is seldom found in conventional employment relationships. Finally, counseling and therapy are deemed more important than work, since inmates are often allowed to attend counseling and therapy sessions during the work day.

Exhibits introduced by the inmates at the evidentiary hearing convincingly demonstrate that education, counseling, treatment and recreation are viewed as the primary end served by providing work experience for inmates. These exhibits indicate that work assignments are considered good correctional treatment, that they teach inmates essential work habits, and that they provide train-

[8] We speak of seniority here in terms of length of time spent in prison, not length of time spent on a particular job.

ing in skilled or semi-skilled trades which can be put to use by the inmates upon release.

We are convinced that the relationship between the inmates and the Department of Corrections, as created and governed by the Correctional Industries Act, is not an employment relationship.[9] It is a custodial, rehabilitative relationship with employment utilized as a means to reach those ends.

Because the inmates are not employees of the Department of Corrections, we conclude that they are not "public employees" under PERA.

We reach that conclusion because we think the Legislature used "employee" in at least the conventional sense in PERA. Since PERA is designed to regulate public employee collective bargaining, strikes, and other labor relations, it would be manifestly beyond the ordinary to include inmates within that framework. We are confident that the Legislature never considered these inmates as potential public employees when PERA was enacted. If they were considered, passage of the more detailed and directly relevant Correctional Industries Act thereafter indicates an abiding intent to exclude inmates from the operation of PERA.

To include inmates as "public employees" would thus do violence to the reasonable meaning of that term as it is used in PERA. It would also threaten the exclusive jurisdiction granted to the Department of Corrections to control "prison labor and

_____

[9] Our conclusion is buttressed by the comparison drawn between the inmates in this case and the student-interns who were deemed "public employees" under PERA in *University of Michigan Regents v Employment Relations Commission,* 389 Mich 96; 204 NW2d 218 (1973). The Supreme Court discussed several aspects of the relationship between the interns and the university *(e.g.,* fringe benefits, furnishing W-2 forms, taking a loyalty oath, being paid by check drawn on a university account) which demonstrated the interns' employee status. The relationship between the inmates and the Department of Corrections possesses none of these features.

industry". MCLA 791.204; MSA 28.2274. If the Legislature really intended the Department of Corrections to have *exclusive* jurisdiction over prison labor, then PERA must be read to accommodate that intent and inmates cannot be public employees subject to the jurisdiction of MERC.

The only Michigan case[10] we have discovered which bears analogically on the problem presented is *Cadeau v Boys' Vocational School,* 359 Mich 598; 103 NW2d 443 (1960). It was there held that the laws regulating child labor do not apply to children working in state vocational schools, both because the language of the child labor statutes does not so specify, *Cadeau, supra,* at 607, 609, and because an educational, not an employment, relationship exists between the wards and their supervisors, *Cadeau, supra,* at 606. The same reasoning, if applied to the instant case, suggests that PERA does not apply to the inmates, both because the statute does not so specify and because a rehabilitative, not an employment, relationship exists between the inmates and the Department of Corrections.

The Department of Corrections is much better suited at this time to deal with inmate labor problems than is MERC. It may well be that the MERC machinery for resolving labor disputes could be effectively applied to a case such as this one. The appropriate forum for the resolution of that question is the Legislature, not this Court.[11]

[10] Only one other state has decided the issue faced here. *Prisoners' Labor Union at Bedford Hills (Women's Division) v Helsby,* 44 App Div 2d 707; 354 NYS2d 694 (1974), is in accord with the result we reach.

[11] We point out an alternative that is now available to the inmates. It was recently held in *LundBerg v Corrections Commission,* 57 Mich App 327; 225 NW2d 752 (1975), that the Commissioner of Corrections has a duty to promulgate regulations pursuant to MCLA 791.206; MSA 28.2276, among other things, "for the management and control

Affirmed. No costs, a public question being involved.

Judge CARLAND did not participate due to illness.

---

of prison labor and industry". The Administrative Procedures Act applies, *LundBerg, supra,* and provides inmates with an important vehicle for taking part in the decision-making process.